IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| REGIONAL HOUSING & COMMUNITY | ) | PROPOSED |
| SERVICES CORP., et al., | ) | Jointly Administered Under |
| | ) | CASE NO. 21-41034-pwb |
| Debtors. | ) | |

DECLARATION OF KATIE S. GOODMAN
IN SUPPORT OF FIRST DAY APPLICATIONS AND MOTIONS

I, Katie S. Goodman, declare under penalty of perjury as follows:

1.

I am the Managing Partner of the financial advisory firm GGG Partners, LLC ("**GGG**"). I have more than 20 years of experience in the practice of turnarounds and restructuring. Among my many engagements, I have acted as receiver, assignee in general assignments for the benefit of creditors, and Chief Restructuring Officer in matters filed under Chapter 11 of the United States Bankruptcy Code.

2.

GGG has been engaged by the Debtors (defined below), including Regional Housing & Community Services Corp. ("**Regional**"), a California nonprofit corporation, to serve as Chief Restructuring Officer, and I have been designated by GGG to fill such role. Since my engagement I have obtained knowledge of and experience with the business and financial affairs of Regional, as well as each of the limited liability companies identified on Exhibit A attached hereto (the "**RHCSC Subsidiaries**"). I understand that Regional is the sole member and parent company of each of the RHCSC Subsidiaries. Regional and the RHCSC Subsidiaries (collectively, the "**Debtors**") are each a debtor and debtor-in-possession in these cases. I am

authorized to submit this declaration in support of the Debtors' First Day Motions (as hereinafter defined). Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided by employees of or professionals retained by the Debtors, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial affairs. Opinions regarding compliance with applicable statutes or rules are based upon advice of counsel. If I were called upon to testify, I would testify competently to the facts set forth herein.

## **Background**

3.

On August 26, 2021 (the "**Petition Date**"), the Debtors each filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are authorized to operate their businesses as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

## **The Relevant Parties**

4.

Debtor Regional Subsidiaries RHCSC Montgomery I Health Holdings LLC, RHCSC Montgomery II Health Holdings LLC, RHCSC Savannah Health Holdings LLC, RHCSC Douglas Health Holdings LLC, RHCSC Rome Health Holdings LLC, RHCSC Columbus Health Holdings LLC, RHCSC Gainesville Health Holdings LLC, and RHCSC Social Circle Health Holdings LLC (each a "**Property Company**" and collectively, the "**Property Companies**") each own a senior living facility (each a "**Facility**" collectively, the "**Facilities**" or the "**Manor House Facilities**").

5.

Debtor Regional Subsidiaries RHCSC Montgomery I AL Holdings LLC, RHCSC Montgomery II AL Holdings LLC, RHCSC Savannah AL Holdings LLC, RHCSC Douglas AL Holdings LLC, RHCSC Rome AL Holdings LLC, RHCSC Columbus AL Holdings LLC, RHCSC Gainesville AL Holdings LLC, RHCSC Social Circle AL Holdings LLC (each an "**Operating Company**" and collectively the "**Operating Companies**") each lease a Facility from the Property Companies.

6.

The Operating Companies have each entered into a Management Agreement (the "**Management Agreements**") with ALG Senior, LLC ("**ALG**") to manage the operations of the Facility that each Operating Company leases from a Property Company.

7.

With respect to each Facility owned by a Property Company and leased and operated by an Operating Company, the Wisconsin Public Finance Authority (the "**Bond Authority**") issued Series 2018A, Series 2018B, Series 2018C and Series 2018D Revenue Refunding Bonds (the "**Bonds**"). The Operating Company and the Property Company for that Facility entered a Loan Agreement with the Bond Authority. The Bond Authority assigned its rights and interest in the Bonds to Huntington National Bank, as trustee, in contemporaneously executed Trust Indentures (the "**Indentures**"). UMB Bank, N.A. is the successor trustee (the "**Trustee**") under the Indentures and that Tortoise Credit Strategies, LLC ("**Tortoise**") is the noteholder representative with respect to such Bonds.

8.

Each Facility is a senior care facility located in a rural city or town in Georgia or Alabama. The Facilities, collectively, house approximately 218 senior residents. ALG and the Debtors take their obligations to care for the residents at the facilities seriously. As explained below, I am informed that ALG has advanced over $3.7 million to cover the Debtors' operational shortfalls to ensure that the senior residents remain well-cared for. The care of the seniors living at the Facilities is paramount in these Bankruptcy Cases.

9.

Unfortunately, the effects of the COVID 19 global pandemic have significantly harmed the financial viability of the Facilities as well as many other operators in the senior care industry. The Debtor Operating Companies and Debtor Property Companies now owe in excess of $55 million on the Bonds, including deferred and past due interest, late fees, and penalties. There is no realistic hope that the Facilities will ever be able to recover sufficient value such that the Bonds could be paid in full. Moreover, ALG has no obligation to and has informed the Debtors that it cannot fund operating shortfalls into perpetuity with no end to the pandemic in sight. I understand that all pre-petition negotiations with the Bond Trustee and Tortoise failed, necessitating this filing to orderly liquidate the Facilities with minimal impact on the residents.

**ALG's History**

10.

I understand that ALG manages over 130 senior living facilities throughout the United States. Most of ALG's facilities under management are located the Southeast.

- 4 -

## <u>The History of the Facilities at Issue</u>

11.

The Facilities at issue in these Bankruptcy Cases are routinely referred to as the "Manor House Facilities." The Manor House Facilities are located throughout Georgia and Alabama.

12.

In May 2016, ALG began managing the Manor House Facilities for a prior owner. Based on information from ALG, the prior owner does not have, and never had, any affiliation with ALG, its principals, or any other of ALG's affiliated entities.

13.

In the Fall 2016, the SEC began investigating the prior owners of the Manor House Facilities. In January 2017, the SEC brought an action against the prior owner in the District of New Jersey and a receiver (the "**SEC Receiver**") was appointed over the Manor House Facilities. The SEC Receiver retained ALG to continue to manage the Manor House Facilities.

14.

One of ALG's other affiliates, Agemark Acquisition, LLC ("**Agemark**"), was the high bidder at the SEC Receiver's sale of the Manor House Facilities.  Agemark then assigned its purchase rights to the Debtor Property Companies to complete the purchase of the facilities.

**The Bond Financing of the Purchase**

15.

The acquisition of the Manor House Facilities was facilitated through a primarily tax-exempt bond structure.  I understand that the negotiations between Tortoise and ALG regarding the structure of the financing and closing of the sale began in the Fall of 2017.  Eventually, the sale of the Manor House Facilities closed in April 2018.  The purchase of those facilities was financed by Tortoise. Tortoise initially loaned funds pursuant to taxable notes to complete the purchase of the Manor House Facilities out of the SEC Receivership. To retire the debt owed pursuant to those taxable notes, Tortoise purchased Series A Bonds (original par amount $30,590,000) and Series B Bonds (original par amount $200,000).  The Series A Bonds are tax exempt.  Later that year, in December 2018, the Debtor Property Companies and Debtor Operating Companies closed on the sale of Series C Bonds (original par amount $11,195,000) and Series D Bonds (original par amount $590,000) to finance repairs and improvements to the Manor House Facilities.  The Series C Bonds are tax exempt.

16.

The total aggregate amount owed currently on the aforementioned Series A, B, C and D Bonds is approximately $55.4 million.

**The Events Giving Rise to Bankruptcy**

17.

According to ALG, during the time it managed the Manor House Facilities under SEC Receivership the operations generally did not generate sufficient cash flow to cover the

operational expenditures.  Further, ALG estimated that the Manor House Facilities, collectively, needed approximately $5 million in repairs, improvements, and deferred maintenance.

18.

ALG and Tortoise reached agreement on financing the repairs and improvements. Ultimately, Tortoise provided the financing for the repairs and improvements through the Series C and Series D Bonds in December 2018.

19.

Following the repairs and improvements, the census at the Manor House Facilities did, generally, start to increase.  However, I understand that this improvement was slower than projected due to construction delays and a negative reaction surrounding the SEC Receivership.

20.

In March 2020, COVID began to significantly disrupt senior care facilities, sending the senior care industry into disarray. COVID had an extremely negative impact on the Manor House Facilities.   During the period from February 2020, through March 2021, monthly census dropped from 290 to 188, and the Debtors incurred substantial additional monthly costs in order to deal with COVID related issues (purchases of PPE, etc.).

21.

Despite the significant challenges posed by COVID, ALG worked to keep the facilities open and to provide care to the senior residents. As the census dropped, ALG funded the continuously increasing operating deficits, eventually advancing in excess of $3.7 million.

22.

With considerable continuing uncertainty caused by the pandemic, no reported progress on negotiations with the Bond Trustee and Tortoise, and ALG's self-reported financial hardships caused by the pandemic on its and its affiliates' entire portfolio, the Debtors were left with no choice by to file for protection under Chapter 11 of the United States Bankruptcy Code.  As noted above, I recognize that there are significant unresolved disputes between the parties, and if these issues cannot be resolved consensually they may eventually need to be litigated.  However, my immediate and primary responsibilities and objectives in connection with my engagement as Chief Restructuring Officer are to maintain stability of the Debtors' operations, ensure that the residents continue to receive high quality care, retain the dedicated employees and staff of the Debtors, and to facilitate a fair sale process for the Manor Care Facilities that maximizes the value of the assets for creditors.

**The First Day Motions**

23.

In conjunction with their bankruptcy petitions, the Debtors filed the motions and applications listed on Exhibit B (collectively, the "**First Day Motions**").  I submit this declaration in support of the First Day Motions.  I have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe that the facts set forth therein are true and correct.  Such representation is based upon information and belief, through my review of various materials and other information, and my experience and knowledge of the Debtors' operations and financial condition.  If called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Motions.

- 8 -

24.

As a result of my first-hand experience, and through my review of various materials and other information, discussions with the representatives of the Debtors and its management company and discussions with outside advisors, I have formed opinions as to: (a) the necessity of obtaining the relief sought in the First Day Motions; (b) the importance of the relief sought in the First Day Motions for the Debtors to continue to operate effectively; and (c) the negative impact upon the Debtors of not obtaining the relief sought in the First Day Motions.

25.

As described more fully below, the relief sought in the First Day Motions will minimize the adverse effects of the Chapter 11 cases on the Debtors and ensure that the Debtors' reorganization efforts proceed as efficiently as possible and result in maximum recovery for creditors, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate as debtors-in-possession.

## **Motion for Joint Administration**

26.

The Debtors are requesting that the Court jointly administer the seventeen (17) related bankruptcy cases in order to promote judicial efficiency and to minimize the administrative expense to each of the Debtors' estates.  As noted above, Regional Housing is the sole member of the RHCSC Subsidiaries.  Joint administration and the maintenance of a single docket will streamline the bankruptcy process, minimize confusion among the creditor body from receipt of multiple pleadings for each Debtor and minimize the administrative expense to the Debtors' estates.  Therefore, joint administration is in the best interest of the Debtors, their creditors and their estates.

## Motion for Additional Time to File Schedules and Statements of Financial Affairs
## (the "Schedules Extension Motion")

### 27.

The Debtors seek entry of an order granting the Debtors an additional thirty (30) days to file their schedules of assets and liabilities, schedules of current expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements"). To prepare the Schedules and Statements, the Debtors must gather information from books, records, and documents relating to a multitude of transactions. Consequently, collection of the necessary information requires the expenditure of substantial time and effort on the part of the Debtors' already over-burdened employees. The efforts of the employees during the initial stages of the Chapter 11 Cases will be focused in large part on attending to the Debtors' business and maximizing the value of the Debtors' estates. For these reasons, the Debtors will likely be unable to complete their Schedules and Statements within fourteen (14) days of filing the petitions.

## Motion for Authority to Retain Kurtzman Carson Consultants LLC as
## Claims, Noticing, and Balloting Agent for the Debtors (the "KCC Retention Motion")

### 28.

The Debtors believe it is necessary and in the best interests of their creditors and estates to engage Kurtzman Carson Consultants LLC ("**KCC**") to act as outside agent to the Clerk of the Bankruptcy Court to assume full responsibility for the distribution of notices and proof of claim forms and the maintenance, secondary processing, and docketing of all proofs of claim filed in the Debtors' bankruptcy cases.  KCC provides comprehensive bankruptcy management services, including data processing, noticing, claims processing, and other administrative tasks in Chapter 11 cases.  In addition, in connection with any plan of reorganization proposed by the Debtors, the

- 10 -

Debtors have determined that they will require the services of KCC with respect to the mailing of the Debtors' disclosure statement, plan, and ballots and in maintaining and tallying the ballots in connection with the voting on such plan.

**Motion for Authority to (A) Maintain Existing Bank Accounts and Cash
Management System, and (B) Continue Use of Existing Business Forms
(the "Cash Management Motion")**

29.

Prior to the commencement of these Chapter 11 cases, the Debtors maintained approximately thirty-three (33) bank accounts with one or more depository institutions, a schedule of which is attached to the Cash Management Motion as <u>Exhibit A</u>. It is critical for the Debtors to be able to continue their existing cash management system (as modified by any debtor-in-possession financing or cash collateral arrangement approved by this Court) during the pendency of these Chapter 11 cases. Any disruption to the Debtors' ordinary business affairs at this critical stage in the reorganization process, including a disruption in collection practices, could adversely impact their ability to successfully reorganize.

30.

The Debtors' pre-petition bank accounts and business forms are integrally related to the Debtors' cash management system. Thus, maintenance of the Debtors' current accounts and forms is necessary to avoid delays, confusion, and disruption of the Debtors' business.

**Motion for Authority to Continue Pre-Petition Insurance Programs and to Pay
Pre-Petition Premiums (the "Insurance Motion")**

31.

In connection with the operation of their businesses, the Debtors maintain various insurance policies and programs (collectively, the "**Insurance Programs**") through certain

insurance carriers (the "**Insurance Carriers**"), including the following coverages: (a) Property; (b) General & Professional & Excess Liability; (c) Auto; (d) Executive Risk (Crime & EPLI); (e) Cyber; (f) Billing E&O; and (f) Workers Compensation.

32.

The Debtors' Insurance Programs include liability and property insurance policies, which provide the Debtors with insurance coverage relating to, among other things, general liability, workers' compensation, business automobile, and property.

33.

The Debtors are required to pay premiums based upon a fixed rate established by the Insurance Carriers.  The premiums for these policies are determined annually and are either (i) directly billed to the Debtors in monthly installments or (ii) financed by the Debtors pursuant to a premium finance agreement.  Additionally, the Debtors are currently party to one or more insurance premium financing agreements (the "**Premium Financing Agreements**") whereby certain of the Debtors' Insurance Programs (the "**Financed Policies**") are financed with one or more premium finance companies (each, a "**Premium Finance Company**"). The Premium Finance Company typically is granted a security interest in, *inter alia*, unearned premiums that would otherwise be returned to the Debtors in the event of policy cancellation.  Copies of Premium Financing Agreements with respect to the Debtors' Financed Policies are attached to the Insurance Motion as composite Exhibit A.  Attached to the Insurance Motion as Exhibit B is a chart which shows the total premium and other amounts charged to the Debtors for each Insurance Program broken down by facility, the amounts due for August 2021, the remaining balance owed, and which of the Debtors' Insurance Programs are included in the Premium Financing Agreements.

Case 21-41034-pwb    Doc 17    Filed 08/27/21    Entered 08/27/21 17:12:12    Desc Main
Document    Page 13 of 25

34.

As of the Petition Date, the Debtors believe that they are current on pre-petition premiums with respect to the Insurance Programs.  To the extent there is an outstanding insurance policy premium for the pre-petition period, however, the Debtors seek authority to pay the pre-petition premium in the ordinary course and as such payments are necessary to keep the Insurance Programs in force.

35.

It is essential to the continued operation of the Debtors' business and their efforts to reorganize that the Insurance Programs and Premium Financing Agreements be maintained on an ongoing and uninterrupted basis.  The failure to pay premiums and/or amounts due under Premium Financing Agreements when due may affect the Debtors' ability to renew the insurance policies.  If the insurance policies are allowed to lapse or otherwise terminated, the Debtors could be exposed to substantial liability for damages resulting to persons and property of the Debtors and others, which exposure could have an extremely negative impact on the Debtors' ongoing business operations.  Such a result would also place at risk the estates' assets that are necessary to satisfy secured and unsecured claims.

**Debtors' Emergency Motion Interim and Final Orders (A) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service on Account of Prepetition Invoices, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment (the "Utilities Motion")**

36.

The Debtors respectfully request the entry of an interim and final order (the "**Interim Order**" and the "**Final Order**", respectively), pursuant to Section 366 of the Bankruptcy Code: (a) prohibiting the Utility Companies from altering, refusing, or discontinuing service on account of prepetition invoices, (b) deeming utilities adequately assured of future performance, and (c)

- 13 -

establishing the Determination Procedures (as defined in the Utilities Motion) for determining adequate assurance of payment.  The Debtors also request that the Court schedule a final hearing at its convenience on a date in advance of the expiration of thirty (30) days following the Petition Date.

37.

The Utility Providers. Utility services are essential to the Debtors' ability to sustain their operations while these Chapter 11 Cases are pending.  In the normal conduct of their businesses, the Debtors have direct relationships with over 20 utility companies (collectively, the "**Utility Companies**") for the provision of electric, water, gas, telephone, internet, and other services (the "**Utility Services**").  A list identifying the Utility Companies is attached to the Utilities Motion as Exhibit A (the "**Utilities Service List**").[1]

38.

At all relevant times, the Debtors have attempted to remain current with regard to their utility bills.  Furthermore, to the best of the Debtors' knowledge, the Debtors are current on all amounts owing to the Utility Companies, other than payment interruptions that may be caused by the commencement of these Chapter 11 cases.  Most of the monthly obligations of each Facility to any one Utility Company are relatively small, with the separate monthly obligations to the vast majority of the Utility Company being less than $4,000.

39.

Continued and uninterrupted Utility Service is vital to the Debtors' ability to sustain their operations during the Case and care for the residents at the various Facilities.  Because of the nature of the Debtors' operations, termination or interruption of the Debtors' Utility Services

---

[1] The listing of any entity on **Exhibit A** attached to the Utilities Motion is not an admission that such entity is a utility within the meaning of section 366 of the Bankruptcy Code.

would dramatically impair the Debtors' ability to conduct business and would cause considerable inconvenience to the Debtors' residents and employees.  If Utility Companies are permitted to terminate or disrupt service to the Debtors, the Debtors' primary revenue source would be threatened and the residents would be endangered.

40.

The Debtors intend to pay all post-petition obligations owed to the Utility Companies in a timely manner and expect that they will have funds sufficient to pay all post-petition utility obligations.  Nevertheless, to provide adequate assurance of payment for future services, the Debtors propose to deposit into a newly-created, segregated, interest-bearing bank account (the "**Adequate Assurance Account**") a sum equal to the cost of two weeks' worth of the average utility cost for all the Utility Companies over all the Facilities (collectively, the "**Adequate Assurance Deposit**").  As of the Petition Date, the Debtors estimate that over an average 4-week period, the total utility costs over all the Facilities totals approximately $106,000.  Accordingly, the Debtors propose that the Adequate Assurance Deposit total approximately $53,000.

41.

Although the Adequate Assurance Deposit will be placed into a single bank account, two weeks' worth of estimated utility costs will be separately allocated for, and payable to, each Utility Company.  Specifically, if the Debtors fail to pay a utility bill when due (including the passage of any cure period), the relevant Utility Company shall provide notice of such default to counsel for the Debtors and counsel to the DIP lender.  If within five (5) business days of the Debtors' receipt of such notice, the bill is not paid, the Utility Company may file an application with the Court certifying that payment has not been made and requesting the amount due up to

- 15 -

an aggregate maximum equal to the Adequate Assurance Deposit allocable to such Utility Company.

42.

The Debtors submit that the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future utility services in the ordinary course of business, constitute sufficient adequate assurance to the Utility Companies. If any Utility Company believes additional assurance is required, they may request such assurance pursuant to the Determination Procedures described in the Utilities Motion.

**Motion for Order Authorizing Payment of Pre-Petition Wages, Payroll Taxes, Certain Employee Benefits, Related Expenses, and Other Compensation to Employees and Independent Contractors (the "Wages and Benefits Motion")**

43.

As of the Petition Date, the Debtors employed approximately 166 employees and independent contractors.

44.

The Debtors have incurred certain pre-petition obligations that remain unpaid as of the Petition Date because they accrued, either in whole or in part, prior to the Petition Date. Even though arising prior to the Petition Date, these obligations (collectively, the "**Obligations**") will become due and payable in the ordinary course of the Debtors' businesses on and after the Petition Date. These obligations can generally be categorized as follows: (i) wages, salaries, and other compensation; (ii) payroll taxes; (iii) qualified 401(k) plan obligations; (iv) health and welfare benefits; and (v) other benefits.

45.

Pursuant to Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, a debtor's

employees' claims for "wages, salaries, or commission, including vacation, severance, and sick leave pay" earned within one hundred eighty (180) days before the Petition Date, and claims against the Debtors for contributions to employee benefit plans arising from services rendered within one hundred and eighty (180) days before the Petition Date, are afforded unsecured priority status to the extent the claims do not exceed $13,650.  11 U.S.C. §§ 507(a)(4)–(5).  As of the Petition Date, the Debtors believe that there are no employees for whom the Payroll Obligations would exceed $13,650.

46.

Any delay in paying the Obligations will adversely impact the Debtors' relationship with their Employees and will irreparably impair the morale, dedication, confidence, and cooperation of the very people upon whom the Debtors rely in order for their businesses to be successful. The Debtors must have the support of their employees in order for the Debtors to maximize the going concern value of their assets.  At this early stage, the Debtors simply cannot risk the substantial damage to their businesses that would inevitably result from a decline in employees' morale attributable to the Debtors' failure to pay previously earned wages, salaries, benefits, and other similar items.

47.

Moreover, absent an order granting the relief requested in this Motion, the Debtors' employees will suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable certain of the employees to meet their own personal financial obligations.  The stability of the Debtors will thus be undermined, perhaps irreparably, by the possibility that otherwise loyal employees will seek other employment alternatives.

- 17 -

**Debtors' Motion for Interim and Final Orders (I) Authorizing (A) Secured Postpetition
Financing Pursuant to 11 U.S.C. §§ 105, 361, 362 and 364(c) and (d); and
(B) Granting Security Interests, Superpriority Claims, and Adequate Protection,
and (II) Scheduling a Final Hearing and Memorandum of Points and Authorities
(the "DIP Financing Motion")**

48.

The Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without DIP Financing (as defined in the DIP Financing Motion). The ability of the Debtors to finance their operations, and the availability of sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money, is essential to the Debtors' ability to operate their businesses. In the absence of such financing, the operation of the Debtors' businesses would not be possible and serious and irreparable harm to the Debtors and their estates would occur.

49.

Prior to the Chapter 11 filing, representatives of the Debtors contacted one or more potential lenders, seeking alternative financing sources. The Debtors were unable to procure financing in the form of unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense under Section 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative expense priority pursuant to Section 364(c)(1) of the Bankruptcy Code without the granting of priming liens on their assets. The Debtors have been unable to procure the necessary financing on terms more favorable than the Interim Order. No other lender was prepared to provide the immediate financing needed by the Debtors on more favorable terms. The DIP Financing proposed by the DIP Lender represents the best alternative available to the Debtors.

50.

The Debtors have exercised sound business judgment in determining that a post-petition credit facility is appropriate and have satisfied the legal prerequisites to borrow under the DIP Financing.  The terms of the DIP Financing are fair and reasonable, are in the best interests of the Debtors' estates and have been negotiated in good faith and at arm's length.  Without the liquidity provided by the DIP Financing, the Debtors will be unable to pay vendors, employees and other constituencies that are essential to the orderly operation of their businesses.  The Debtors' management exercised their best business judgment in negotiating the DIP Financing that is presently before the Court.

51.

For these reasons, access to credit under the DIP Financing is critical.  The Debtors cannot wait for the beneficial effects of the DIP Financing; any substantial delay could have the same impact as denial of the Motion.  The Debtors' need for access to the DIP Financing therefore is immediate.

52.

A proposed Interim Order is attached as an exhibit to the DIP Financing Motion and is incorporated herein by reference.  Pending the Final Hearing (as defined in the DIP Financing Motion), the Debtors require immediate financing under the terms and conditions set forth in said Interim Order for, among other things, financing their operations and other working capital needs.  It is essential that the Debtors immediately stabilize their operations and resume paying for ordinary, post-petition operating expenses, as well as the pre-petition expenses approved in the first day orders, to minimize the damage occasioned by their cash flow problems.

53.

Absent immediate financing, the Debtors will be unable to pay ongoing operational expenses. Consequently, if interim relief is not obtained, the Debtors' assets will be immediately and irreparably jeopardized, to the detriment of their estates, their creditors and other parties in interest.

**Motion for Authority to Use Cash Collateral
(the "Cash Collateral Motion")**

54.

In order to carry on their business operations during the Chapter 11 process, in addition to the proposed DIP Financing the Debtors will require the use of cash receipts and collections generated through the operation of the Manor House Facilities ("**Cash Collateral**"). The DIP Facility is intended to be a supplement to, and not a substitute for, the Debtors' use of Cash Collateral. As of the Petition Date, the Debtors (other than Regional Housing & Community Services Corporation) were indebted to Trustee in the approximate collective principal amount of $46,791,827.83, plus $8,686,267.40 for obligations for contract interest, default interest and charges, legal fees, and certain fees and charges (collectively, the "**Pre-Petition Obligations**"), under various Loan Agreements dated June 1, 2018 (the "**Pre-Petition Loan Agreements**"; together, with all related agreements, documents and instruments, the "**Pre-Petition Bond Documents**"). The Trustee asserts a security interest under the Pre-Petition Bond Documents in certain property of the Debtors, including Cash Collateral, as security for the Pre-Petition Obligations.

55.

The Debtors have filed their Cash Collateral Motion seeking authority to use Cash Collateral in order to pay necessary expenses incurred in connection with the operation of their

- 20 -

business, to preserve the value of their assets and/or to enable the Debtors to administer their estates as required under the Bankruptcy Code. The Debtors' use of Cash Collateral is essential to the continued operation of their businesses, to maintain the value of the Manor House Facilities and for an effective reorganization. The Debtors do not propose to use cash collateral to pay any amounts due and owing prior to the Petition Date absent further order of the Court. However, because of the nature of the Debtors' businesses, they must have use of cash collateral to meet their ongoing obligations and to preserve the value of their assets. Therefore, the use of cash collateral is in the best interest of the Debtors, their estates and their creditors.

56.

In the Cash Collateral Motion the Debtors have proposed to provide adequate protection for the use of Cash Collateral as follows:

(a)    The Trustee shall be given a replacement lien on all of the Debtors assets, and proceeds thereof, to the extent such pre-petition liens are valid, properly perfected and enforceable interests, and in the same relative priority, except that, pursuant to the DIP Loan Agreement and any order entered in connection therewith, the Trustee's replacement lien would be subordinate to all amounts owed to the DIP Lender pursuant to the DIP Loan Agreement; and

(b)    Cash Collateral may only be used for items set forth in a Budget (as defined in the Cash Collateral Motion).

57.

A proposed Interim Order is attached as exhibit to the Cash Collateral Motion. Pending a final hearing on the Cash Collateral Motion, the Debtors requires use of Cash Collateral to continue operating their businesses, including making payroll, paying vendors and suppliers for post-petition obligations, to maintain the value of the Manor House Facilities, to protect residents

of the facilities, and to meet ordinary working capital expenses.  Potentially irreparable harm to the Debtors, their creditors and their estates may occur absent authorization for the use of Cash Collateral.  The Debtors' need for use of Cash Collateral is ongoing, immediate and critical. Granting the relief sought in the Cash Collateral  Motion, including entry of the proposed Interim Order, will preserve the assets of Debtors' estates and their value and is in the best interests of the Debtors, their creditors and the Debtors' estate.

## <u>Conclusion</u>

Accordingly, for the reasons stated herein, and in each of the First Day Motions, I respectfully request that each of the First Day Motions be granted in its entirety, together with such further relief as the Court deems just and proper.

Executed this 27th day of August, 2021.


/s/ Katie S. Goodman
Name:  Katie S. Goodman
Title:  Managing Partner, GGG Partners, LLC


*Penalty for making a false statement or concealing property:* Fine of up to $500,000 or imprisonment for up to 5 years or both.  18 U.S.C. §§152 and 3571.

## EXHIBIT A

## RHCSC SUSIDIARIES

RHCSC Montgomery II Health Holdings LLC
RHCSC Montgomery II AL Holdings LLC
RHCSC Montgomery I Health Holdings, LLC
RHCSC Montgomery I AL Holdings LLC
RHCSC Savannah Health Holdings LLC
RHCSC Savannah AL Holdings LLC
RHCSC Douglas Health Holdings LLC
RHCSC Douglas AL Holdings LLC
RHCSC Rome Health Holdings LLC
RHCSC Rome AL Holdings LLC
RHCSC Columbus Health Holdings LLC
RHCSC Columbus AL Holdings LLC
RHCSC Gainesville Health Holdings LLC
RHCSC Gainesville AL Holdings LLC
RHCSC Social Circle Health Holdings LLC
RHCSC Social Circle AL Holdings LLC

**EXHIBIT B**
**INDEX OF FIRST DAY MOTIONS**

| | |
|---|---|
| 1. | Motion for Joint Administration |
| 2. | Motion for Authority to Retain Kurtzman Carson Consultants LLC as Claims, Noticing, and Balloting Agent for the Debtors |
| 3. | Motion for Additional Time to File Schedules and Statements of Financial Affairs |
| 4. | Motion for Authority to (A) Maintain Existing Bank Accounts and Cash Management System, and (B) Continue Use of Existing Business Forms |
| 5. | Debtors' Emergency Motion for Interim and Final Orders (A) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service on Account of Prepetition Invoices, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment |
| 6. | Motion for Authority to Continue Pre-Petition Insurance Programs and to Pay Pre-Petition Premiums |
| 7. | Motion for Order Authorizing Payment of Pre-Petition Wages, Payroll Taxes, Certain Employee Benefits, Related Expenses, and Other Compensation to Employees and Independent Contractors |
| 8. | Motion for Authority to Use Cash Collateral |
| 9. | Debtors' Motion For Interim And Final Orders (I) Authorizing (A) Secured Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, And 364(c) and (d); and (B) Granting Security Interests, Superpriority Claims, And Adequate Protection, and (II) Scheduling a Final Hearing; And Memorandum Of Points And Authorities |

4852-1769-5735.v3